FIRST AMERICAN TITLE COMPANY OF SOUTH DAKOTA and First American Title Insurance Company of South Dakota

v.

SOUTH DAKOTA LAND TITLE ASSOCIATION, South Dakota Abstracters Board of Examiners, Black Hills Land and Abstract Company, Dennis O. Murray, Security Land and Abstract Company, Glen M. Rhodes, Fall River County Abstract Company, Charles E. Clay, Custer Title Company, Betty J. Gould, Haakon County Abstract Company, Keith Emerson, Wayne Roe and Charles Nass.

No. CIV 80–5076.

United States District Court, D. South Dakota.

June 8, 1982.

Donald R. Shultz, Rapid City, S. D., for plaintiffs.

Gary F. Colwill, Asst. Atty. Gen., Mark V. Meierhenry, Atty. Gen., Pierre, S. D., E. James Hood, Spearfish, S. D., Keith R. Smit, Sturgis, S. D., for defendants.

## MEMORANDUM OPINION

BOGUE, Chief Judge.

This matter is an antitrust suit brought under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and tried before this Court on June 15, 16, 17 and 19 of 1981. Plaintiffs are First American Title Company of South Dakota, which is a South Dakota company presently doing business within South Dakota, and First American Title Insurance Company of South Dakota, which operated in South Dakota until May, 1980, when the company was voluntarily dissolved. The Defendants include the South Dakota Land Title Association (SDLTA), which is an unincorporated association of land title abstractors in South Dakota, and the South Dakota Abstracters' Board of Examiners (SDABE), which is a South Dakota state agency under the South Dakota Department of Commerce. *See* SDCL ch. 36–13. SDABE regulates real estate title abstractors in the state of South Dakota. The remaining Defendants are Western South Dakota abstract companies and individual licensed abstractors, all of whom are

members of Defendant SDLTA and some of whom are members of Defendant SDABE. The State of South Dakota has also been joined as a defendant pursuant to a motion of SDABE.

Plaintiffs allege the Defendants have engaged in a conspiracy in restraint of trade and have also monopolized, attempted to monopolize, and engaged in a conspiracy to monopolize, all in violation of §§ 1 and 2 of the Sherman Act. The basic allegations in Plaintiffs' complaint are found in ¶¶ 21(a) through (h). Plaintiffs allege that the Defendants conspired to: (a) fix the price to Plaintiffs of abstractor countersignatures on title insurance policies; (b) engage in frivolous and sham litigation by appealing the decision of the South Dakota Director of Insurance to grant a certificate of authority to Plaintiff First American Title Insurance Company to do business in South Dakota; (c) engage in frivolous and sham litigation by participating in the case of *Fall River County Abstract Company v. Knutson*, (6th Judicial Circuit Court, Hughes County, S.D., Nov. 6, 1979, Judge Robert A. Miller, presiding); (d) engage in efforts to influence the enactment of S.L. 1979, ch. 345, amending SDCL 58–25–16, which had the effect of requiring all title insurance policies issued in the state to contain the countersignature of an abstractor; (e) enforce and attempt to enforce SDCL 58–25–16; (f) attempt to establish a fee schedule for countersignatures to be provided by abstractors on title insurance policies; (g) enforce and attempt to enforce ARSD § 20:36:04:01; (h) engage in a publicity campaign directed against the Plaintiffs, ostensibly directed toward influencing government action, which campaign was a sham to cover an attempt to interfere with the business relationships of the Plaintiffs.

The licensing of abstractors in South Dakota is governed by SDCL 36–13. That chapter created Defendant SDABE to act as the state agency to regulate the abstracting business in South Dakota.

Most South Dakota counties have only one abstract firm. Plaintiffs have attempted to show that this condition was created by SDABE regulations which, Plaintiffs have alleged, make it financially prohibitive to open a competing abstract plant in any county. Plaintiffs have further alleged that it is the goal of Defendants SDABE and SDLTA to maintain the status quo so as to shield SDLTA members from competition within their individual counties.

Plaintiff First American Title Company was organized by Walter J. Linderman and began operating in Pennington County, South Dakota in 1974. It acted as the local agent for a foreign title insurance company. Under South Dakota law in effect at that time, a countersignature by a licensed abstractor or abstract company was required on all title insurance policies issued by foreign title insurance companies. Linderman, through First American Title Company, could countersign policies on property in Pennington County. However, in other counties countersignatures had to be obtained from other abstractors for a price which in Plaintiffs' opinion was too high.

Because a countersignature was not required on domestic title insurance policies, Linderman decided to organize a domestic title insurance company. By doing this he could issue title insurance policies throughout the state without the necessity of an abstractor's countersignature. Linderman incorporated Plaintiff First American Title Insurance Company in December, 1978, for this purpose.

Plaintiffs claim that the Defendants were opposed to Linderman's establishing a domestic title insurance company and united in an attempt to thwart his efforts. The first step allegedly taken by Defendants was intense lobbying which resulted in South Dakota law being changed so as to make it necessary for all title insurance policies, both foreign and domestic, to be countersigned by an abstractor. This again made it necessary for Linderman's First American Title Insurance Company to obtain countersignatures from other abstractors on policies dealing with property outside Pennington County.

The second step allegedly taken by Defendants to damage Plaintiffs' business was

SDLTA's opposition to First American Title Insurance Company's application for a certificate of authority to do business in the state. Plaintiffs charge that SDLTA had no justification for attacking First American Title Insurance Company's application and did so just to harass Plaintiffs. The application was granted by the South Dakota Director of the Division of Insurance. This decision, however, was then appealed to state court and was affirmed. Plaintiffs allege that the sole purpose of this appeal was to harass and competitively injure First American Title Insurance Company.

Plaintiffs charge that the conspiracy against them continued after the statute regarding countersignatures on title insurance policies was changed in 1979. After this statutory change, the South Dakota Attorney General held that the Division of Insurance, and not Defendant SDABE, had the authority to hold hearings to adopt a rule to fix the countersignature fee that could be charged by abstractors. According to Plaintiffs, Defendants opposed this ruling because they feared the Division of Insurance would set the fees too low and there would then be a widespread proliferation of title insurance throughout the state. To regain control for SDABE, SDLTA commenced litigation to attack the jurisdictional basis for the right of the Division of Insurance to set the countersignature fees. The court disagreed, ruling that the Division of Insurance did have this authority.

While the *Fall River County Abstract Company, supra,* decision was pending on appeal, Plaintiffs charge that Defendants successfully lobbied the legislature to give the authority to establish a fee schedule to SDABE. This law, which amended SDCL 36–13–25,[1] became effective July 1, 1980. Another statute dealing with abstractor countersignatures was also enacted in 1980.[2] This statute declared that an abstractor's countersignature on a title insurance policy was a verification that the abstractor had performed a title search on the property involved.[3]

Plaintiffs charge that after all these legislative changes were made, Linderman experienced numerous problems obtaining countersignatures for title insurance policies issued outside of Pennington County. The Plaintiffs have claimed that abstractors sought to charge fifty percent of the policy premium for providing the countersignatures. Plaintiffs have also charged that the various abstractors contacted about countersigning First American Title Company's title insurance policies communicated with other abstractors in the state to establish a fee schedule for countersignatures in the absence of any such statute or regulation governing such fees. Plaintiffs charge that as a result of these legislative changes and the resulting problems First American Title Insurance Company had with obtaining countersignatures, Plaintiff First American Title Insurance Company was no longer able to exist financially and was dissolved in May, 1980.

In a nutshell, Plaintiffs allege that the activities of the Defendants were meant to harass and injure them. It is further claimed that this harassment allegedly led to the failure of First American Title Insurance Company and has obstructed Plaintiff First American Title Company from conducting title work in counties other than Pennington County.

1. The pertinent portion of SDCL 36–13–25 provides as follows: "[The Abstracters' Board of Examiners] shall also establish a schedule of fees and the requirements for an abstractor's services for countersigning title insurance policies pursuant to § 58–25–16."

2. The statute referred to is SDCL 36–13–26.1 which provides: "An abstractor's countersignature on a title insurance policy is verification that the abstractor has furnished the insurer a report based on the examination of recorded title and any other title information and services required by the insurer and § 36–13–25."

3. One of the bases for the ruling in the *Fall River County Abstract Company* case was that South Dakota law did not require any affirmative act on the part of the abstractor countersigning the title insurance policy. Before the enactment of S.D.C.L. 36–13–26.1, there was no requirement that the abstractor search the title or do anything else before countersigning.

All of the Defendants have cited three major areas of law in support of their opposition to Plaintiffs' allegations: The McCarran-Ferguson Act, 15 U.S.C. §§ 1011 *et seq.*; the Noerr-Pennington doctrine; and the so-called state action doctrine. In addition, Defendants SDABE and the state of South Dakota have alleged immunity under the eleventh amendment.

This Court will analyze each of these areas of the law as they apply to the eight allegations of Plaintiff's complaint.

## McCARRAN–FERGUSON ACT

The McCarran-Ferguson Act[4] was passed in response to the decision of the United States Supreme Court in *United States v. South-Eastern Underwriters Association,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), in which it was held that Congress did not intend to exempt the business of insurance from the Sherman Act. The McCarran Act made the Sherman Act applicable to the business of insurance only to the extent insurance was not regulated by state law.[5]

The portions of the McCarran Act with which we are concerned in this case provide as follows:

**4.** For the most part, this opinion will henceforth refer to the McCarran-Ferguson Act as simply the McCarran Act.

**5.** For a more complete discussion of the history and development of the McCarran Act, *see, St. Paul Fire & Marine Insurance Co. v. Barry,* 438 U.S. 531, 538, 98 S.Ct. 2923, 2928, 57 L.Ed.2d 932 (1978).

**6.** Prior to July 1, 1979, S.D.C.L. 58–25–16 provided as follows: "No foreign insurance company shall issue any policy of title insurance or certificate of title or other guarantee of title, covering any property located within the state of South Dakota, unless the same is countersigned by a person, partnership or corporation, who has met the requirements of §§ 36–13–8 and 36–13–10 in the county in which the real property is located, or maintains an abstract plant in the county where the real property is located and meets the requirements of ch. 36–13. A violation of this section is a Class 2 misdemeanor." However, the 1979 legislature deleted the word "foreign" in the first sentence, thereby requiring all title insurance companies to obtain countersignatures on their policies.

That after June 30, 1948, the Act . . . known as the Sherman Act . . . shall be applicable to the business of insurance to the extent that such business is not regulated by State law. 15 U.S.C. § 1012(b).

However, 15 U.S.C. § 1013(b) provides:

Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

Defendants argue that the business of title insurance is part of the business of insurance, is regulated by the state of South Dakota and, therefore, this Court has no jurisdiction to consider those allegations in the complaint which concern the title insurance business. The allegations which Defendants argue are defeated by the McCarran Act are those which refer to the alleged fixing of prices for abstractor countersignatures on title insurance policies (¶ 21(a) of Plaintiffs' complaint), the enforcement of the statute requiring countersignatures on title insurance policies (¶ 21(e) of Plaintiffs' complaint,[6] the alleged attempt by Defendants to establish a fee schedule for abstractors' countersignatures (¶ 21(f) of Plaintiffs' complaint), and the enforcement of ARSD § 20:36:04:01 (¶ 21(g) of Plaintiffs' complaint).[7]

**7.** ARSD § 20:36:04:01 provides: "Before any person, firm, or corporation shall be entitled to a certificate of registration to engage in abstracting under the laws of South Dakota, he shall have an approved abstract plant containing the following: (1) a complete index showing every instrument recorded in the register of deeds' office in the county wherein he proposes to operate, properly listed against the specific property which it affects, and also a separate index showing all recorded instruments which do not affect specific property. This index may be compiled on cards, in bound books, or a loose-leaf form, but must be made from an actual check of each page of each book of recorded instruments in said office, and in no case will a copy or film of the numerical index in the register's office be accepted; (2) in case a numerical index is used showing only the book and page of each instrument, then and in that case such index must be supplemented by a take-off of each instrument properly arranged in the said abstract plant so that it can be located from its own numerical index. Such take-off shall be sufficiently complete to show all essential parts of each instrument, such

In response, Plaintiffs contend that the conduct alleged in the complaint does not involve the business of insurance because none of the Defendants are insurers and because they are not regulated by the South Dakota Division of Insurance with respect to their abstracting activities. Plaintiffs further argue that the alleged actions of the Defendants are not regulated by the state of South Dakota and therefore, the McCarran Act is not applicable. Finally, Plaintiffs argue that the alleged activities of Defendants fall within the boycott, coercion or intimidation exception to the McCarran Act contained in 15 U.S.C. § 1013(b).

Whether or not title insurance is part of the business of insurance for purposes of the McCarran Act is considered in *Commander Leasing Company v. Transamerica Title Insurance Company*, 477 F.2d 77 (10th Cir. 1973), and *Schwartz v. Commonwealth*, 374 F.Supp. 564 (E.D.Pa.1974). In both these cases, the Plaintiffs argued that title insurance is unlike other insurance in that the major emphasis of title insurance is the title search rather than insuring against a potential loss. Because of this, it was argued that title insurance is not covered by the McCarran Act. Both courts disagreed. The *Schwartz* court commented:

> [I]t would be in our view unrealistic, indeed ostrich-like, to separate the title search process from the pure insurance aspect of the title companies' activities and, as plaintiffs urge, to call only the latter "the business of insurance." *Id.* at 574.

■ The requirement that title insurance policies be countersigned by an abstractor clearly falls within the business of insurance. Under present South Dakota law, abstractor countersignatures are an integral part of the business of title insurance in South Dakota. Therefore, as to Plain-

tiffs' allegation that Defendants have violated the Sherman Act by enforcing or attempting to enforce SDCL 58–25–16, it follows that this conduct is part of the business of insurance for McCarran Act purposes. However, as to the other allegations dealing with countersigning—that Defendants have conspired to fix the price for countersignatures and that they have conspired to attempt to establish a fee schedule for countersignatures—it would be stretching the McCarran Act beyond its intended purpose to hold that these allegations are part of the business of insurance. Although this Court has found that the countersignature requirement itself is included in the business of insurance, the decision of individual abstractors or Defendant SDABE as to what should be charged for this service is too far removed from the business of title insurance to warrant a McCarran Act exemption. The charge made for countersignatures is part of the business of abstracting, not title insurance.

The antitrust allegations in both *Commander Leasing, supra*, and *Schwartz, supra*, concerned charges made for certain services. However, both cases involved charges made by title insurance companies to either the buyer or seller of property. At issue in the allegations in question are charges made by abstractors to a title insurance company.

■ This Court reaches the same conclusion with regard to Plaintiffs' allegation that the Sherman Act has been violated by Defendants' actions to enforce or attempt to enforce ARSD § 20:36:04:01. This regulation sets up requirements for abstract plants. This certainly cannot be considered to be part of the business of insurance. Although certain abstracting services which are performed in conjunction with the issuance of a title insurance policy are included within the business of insurance, not all

---

names, dates, descriptions, acknowledgements, filings, and any special or unusual recitals, covenants, warranties, exceptions or reservations. Such take-off may be made on cards, on looseleaf form or in bound books or film; (3) if the form of index is a card, a looseleaf sheet, or the page of a bound book showing all instruments

affecting a particular piece of farmland, or town lot or block, then such index must be in such form as to show all names, dates, acknowledgements, seals, and filings, and also a column to show any special or unusual recitals in each instrument.

**1154**

abstracting activities can be considered part of the business of insurance. Certainly, requirements for abstract plants are not concerned with the business of insurance. Therefore, this Court finds that the McCarran Act does not bar the allegation contained in ¶ 21(g) of Plaintiffs' complaint.

■ In light of this Court's determination that the countersignature requirement is part of the business of insurance for purposes of the McCarran Act, the next question is whether the alleged conduct of the Defendants is regulated by state law. In answer to this question it must be noted that the title insurance business is thoroughly regulated by South Dakota state law. SDCL 58–25.[8] Therefore, unless the allegation contained in ¶ 21(e) of Plaintiffs' complaint [9] falls within the boycott, coercion or intimidation exception, the McCarran Act will deny this Court jurisdiction over this allegation.

In *St. Paul Fire & Marine Insurance Company v. Barry*, 438 U.S. 531, 536, 98 S.Ct. 2923, 2927, 57 L.Ed.2d 932 (1978), the Supreme Court adopted the First Circuit Court of Appeals' definition of boycott, that being "[a] 'conserted refusal to deal' with a disfavored purchaser or seller." 555 F.2d 3 at 7. In regard to ¶ 21(e) of Plaintiffs' complaint, this Court finds no facts which would cause this allegation to fall within the boycott exception. Although it is not necessary for the complaint to specifically allege a boycott in order to invoke the exception, *Ballard v. Blue Shield of Southern West Virginia, Inc.*, 543 F.2d 1075 (4th Cir. 1976), this Court finds that nothing in this allegation even raises an issue of a boycott, coercion or intimidation.

Based on the foregoing, this Court concludes that ¶ 21(e) of Plaintiffs' complaint is outside the jurisdiction of the Sherman Act under the authority of the McCarran Act.

Therefore, this Court will now ascertain whether the Sherman Act has been violated by the conduct alleged in ¶ 21(a) of the complaint. ¶ 21(f) of the complaint will be examined elsewhere in this opinion.

The conduct of the individual abstractor Defendants with respect to the allegations of price fixing contained in ¶ 21(a) does not violate 15 U.S.C. § 1 or § 2.

The Plaintiffs have claimed that the individual abstractor defendants conspired to fix prices by setting the abstractor's countersignature fee at fifty percent of the title insurance premium. This Court has spent a considerable amount of time examining the evidence introduced on the allegation of conspiracy to fix prices. Initially, this Court found no direct evidence of any formal agreement between the defendant abstractors. However, such a finding is not fatal to the Plaintiffs' allegation of conspiracy. In cases where conspiracy is claimed it is rare that a plaintiff can ever show or produce direct evidence of an agreement to fix prices. *American Tobacco Co. v. U. S.*, 328 U.S. 781 at 810, 66 S.Ct. 1125 at 1139, 90 L.Ed. 1575; *Milgram v. Loew's, Inc.*, 192 F.2d 579 (3rd Cir. 1951), *cert. denied* 343 U.S. 929, 72 S.Ct. 762, 96 L.Ed. 1339 (1952). Accordingly, this Court has closely examined the evidence concerning the dealings between Plaintiffs and the abstractor Defendants.

■ From such examination this Court does not find that the Plaintiffs have proved the presence of a conspiracy. It

---

8. *See Lawyers Title Company of Missouri v. St. Paul Title Insurance Corporation*, 526 F.2d 795 (8th Cir. 1975), *Commander Leasing, supra*, and *Swartz, supra*, which discuss the regulation of title insurance business in Missouri, Colorado, and Pennsylvania, respectively. It should also be noted that whether or not a state's regulation of insurance is effective is not relevant for McCarran Act purposes. *Seasongood v. K & K Insurance Agency*, 548 F.2d 729 (8th Cir. 1977); *Lawyers Title Company, supra*.

9. As noted, this paragraph concerns Plaintiffs' allegation that Defendants conspired to enforce or attempt to enforce S.D.C.L. 58–25–16. There is a question about whether Defendants have any connection with the enforcement of this statute. The statute makes it a Class 2 misdemeanor to violate its provisions. It would appear that the duty to enforce a statute rests with the various states attorneys of South Dakota. However, due to this Court's determination regarding the McCarran Act (infra), further discussion of this issue is not required.

appears to this Court that, at the most, the actions of the individual abstractors may have constituted parallel action. The Eighth Circuit Court of Appeals in *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877 (8th Cir. 1978), noted that, ". . . similar practices by competitors, *i.e.*, 'conscious parallelism', will sometimes support an inference of an agreement." *Id.* at 884. Generally, however, mere conscious parallelism is not enough to support a finding of conspiracy.

■ The Eighth Circuit Court of Appeals, in *Admiral Theatre Corp. v. Douglas Theatre Co., supra,* noted *Theatre Enterprises v. Paramount Film D. Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954) where the Supreme Court said, "Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely." *Id.* at 541, 74 S.Ct. at 259. In this case, the Plaintiffs must be able to show, through additional facts, that the conscious parallel actions of the alleged conspirators were concerted and interdependent. *Levitch v. Columbia Broadcasting System, Inc.*, 495 F.Supp. 649, 674 (S.D.N.Y.1980); *National Auto Brokers v. General Motors Corp.*, 572 F.2d 953 (2nd Cir. 1978), *cert. denied* 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979); *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1042–43 (2nd Cir. 1976) *cert. denied* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). This Court should be able to find that the Defendants' actions were made in the ". . . collective self-interest of the conspirators rather than, or in addition to, their individual self interest." *Levitch v. Columbia Broadcasting System, Inc.*, 495 F.Supp. at 675. In *Admiral Theatre Corp. v. Douglas Theatre Co.*, the Eighth Circuit Court of Appeals, when considering when parallel action may be used to properly infer an agreement, stated, "Only where the pattern of action undertaken is inconsistent with the self-interest of the individual actors, were they acting alone, may an agreement be inferred solely from such parallel ac-

tion." *Id.* at 884. After having considered the evidence in light of the law as applied to parallel action, this Court is unable to find the presence of conspiracy. Plaintiffs have been unable to show that the Defendants' actions were more consistent with conspiracy to fix prices than with individual business decisions. Additionally, Plaintiffs have been unable to elicit sufficient evidence to prove that the Defendants' actions were interdependent or concerted. Thus, the indication of possible parallel action, without more, does not allow this Court to properly infer conspiracy.

A review of the evidence indicates that, while the initial countersignature fees charged by the abstractor defendants tended to be fifty percent of the title insurance premium, the fees generally varied from five to fifty percent of the title insurance premium. It appears that Defendant Eddie Clay, owner of the Fall River County Abstract Company, agreed with Walter Linderman to charge a fee of thirty-five percent of the premium. (Testimony of Walter J. Linderman, trial transcript pp. 299, 300.) Mr. Linderman's testimony also indicates that in October, 1980, he voluntarily paid Defendant Dennis O. Murray a higher countersignature fee than Mr. Murray had been charging. In his letter to Mr. Murray dated October 31, 1980, Mr. Linderman stated that he thought the fee was fifty percent. (Mr. Linderman's testimony, trial transcript p. 321, trial exhibit # 156.) Furthermore Mr. Dale Morman, an attorney practicing in Sturgis, South Dakota, testified that, in a meeting with Defendant Glen Rhodes on August 1, 1979, Mr. Linderman offered to pay a fifty percent countersignature fee to Mr. Rhodes for countersigning title insurance policies. (Testimony of Dale Morman, trial transcript, p. 360.) On direct examination Mr. Linderman said Mr. Rhodes had asked for a fifty percent fee. (Trial transcript, p. 90.) However, in his cross-examination testimony concerning the meeting, Mr. Linderman could not recall who proposed the fifty percent fee. Mr. Linderman did claim that he did not propose the fifty percent fee. (Trial tran-

script, pp. 325, 326.) Such evidence is equivocal and is not sufficient to meet Plaintiffs' burden of proof concerning the allegations of conspiracy to fix prices contained in ¶ 21(a) of the complaint.

The Plaintiffs' evidence concerning price fixing by Defendant Betty Gould of Custer, South Dakota, is typical of the Plaintiffs' inability to clearly meet their burden of proof on the price fixing allegation. In their proposed finding # 73 the Plaintiffs ask this Court to find that on July 29, 1979, Betty Gould refused to sign a title insurance policy, tendered to her by Mr. Linderman, because she did not want to sign the policy until she had discussed the matter with other abstractors. Such a finding would misstate the record. This Court is unable to find, either in the transcript or in the deposition of Betty Gould, where Defendant Gould stated that she needed to talk with other abstractors. It appears that, at the most, she may have used the term "others". Further examination of the transcript of her deposition would indicate that the "others" Betty Gould spoke with, prior to signing the policy, were her attorney, a Mr. Baldwin, her insurance agent and her errors and omissions policy carrier. (Walter Linderman testimony, trial transcript, pp. 95, 298.) (Deposition of Betty J. Gould, 12–10–80, pp. 38, 40, 48 and 49.) This Court cannot find that the term "others" as it may have been used by Betty Gould, clearly included the other defendants in this action. The Plaintiffs have simply failed to introduce sufficient evidence to meet their burden of proof. Accordingly, this Court finds that, with regard to the conduct complained of in ¶ 21(a) of the complaint, the Defendants are not liable to Plaintiffs under 15 U.S.C. § 1 or § 2.

## NOERR–PENNINGTON DOCTRINE

Defendants also urge that the Noerr-Pennington Doctrine bars portions of Plaintiffs' complaint. The Noerr-Pennington Doctrine had its birth in *Eastern RR Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). The gist of the complaint in that case was that the petitioners had violated the Sherman Act by orchestrating a publicity campaign against the respondents designed to foster the adoption and retention of laws damaging to the trucking industry. Although the court found that petitioners' motive was to destroy respondents as competitors, it was held, on the basis of the first amendment, that this fact could not transform the lawful action of petitioning the government into a Sherman Act violation. The decision in *Noerr* was expanded upon in *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), wherein the court stated:

Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act. *Id.* at 670, 85 S.Ct. at 1593.

Although *Noerr* and *Pennington* only spoke in terms of approaches to legislative bodies, the rule established in those cases was extended to requests for relief made to administrative agencies and courts in *California Motor Transport Company v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

Like most legal doctrines, there is an exception to the Noerr-Pennington Doctrine. This exception was first noted in *Noerr* where the court indicated that a campaign which is a mere sham to cover what is nothing more than an attempt to interfere with another's business relationships is not shielded from the Sherman Act by the first amendment. The "sham exception" was further developed in *California Motor Transport*, wherein the court held that the Sherman Act proscribed the conduct of the petitioners who had sought to bar their competitors from meaningful access to adjudicatory tribunals and to usurp the decision-making process. From a study of both *Noerr* and *California Motor Transport*, it follows that the sham exception would encompass lobbying or litigation efforts which are solely directed toward either interfering with another's business interests or are directed toward seeking to bar another from meaningful access to adjudicatory tribunals.

Defendants claim that several of Plaintiffs' allegations are barred by the Noerr-Pennington Doctrine, including: the allegation the Defendants conspired to engage in sham litigation by appealing the decision to grant a certificate of authority to First American Title Insurance Company (¶ 21(b) of Plaintiffs' complaint); the allegation the Defendants conspired to engage in sham litigation by participating in the *Fall River County Abstract Company v. Knutson* case (¶ 21(c) of Plaintiffs' complaint); the allegation the Defendants conspired to engage in efforts to influence the enactment of S.L. 1979, ch. 345, amending SDCL 58–25–16 (¶ 21(d) of Plaintiffs' complaint); and the allegation the Defendants conspired to engage in a publicity campaign directed toward interfering with Plaintiffs' business relationships, (¶ 21(h) of Plaintiffs' complaint).

■ This Court will first address Defendants' alleged activities to influence the enactment of S.L. 1979, ch. 345, which amended SDCL 58–25–16. Plaintiffs claim that these efforts were part of a larger scheme to monopolize and restrain trade in the abstracting business. Nonetheless, this activity falls squarely within the confines of the Noerr-Pennington Doctrine. The *Noerr* court stated:

> The right of people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so. It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors. *Id.* 365 U.S. at 139, 81 S.Ct. at 530.

It should also be noted the Defendants were successful in their lobbying efforts. They went to the legislature with a proposal and the legislature adopted this proposal. This is a classic case of a group of persons petitioning their government for relief and receiving the relief they request. Such activity is protected from the Sherman Act. *See Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers,* 542 F.2d 1076 (9th Cir. 1976); *Central Bank of Clayton v. Clayton Bank,* 424 F.Supp. 163 (E.D.Mo.1976), *aff'd* 553 F.2d 102 (8th Cir. 1977), *cert. denied* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977). The fact Defendants obtained the relief they were seeking from the legislature indicates that their efforts were directed toward that end and were not a sham. There is no evidence that Defendants' activities to amend SDCL 58–25–16 were a mere sham to cover attempts to interfere with Plaintiffs' business activities.

■ The same reasoning can be applied to Defendants' participation in the *Fall River County Abstract Company v. Knutson* case. As noted earlier, this case involved the question of who was the proper party to establish a fee schedule for countersigning of title insurance policies by abstractors. The South Dakota Attorney General ruled in 1979 that the Division of Insurance, rather than Defendant SDABE, should perform this task. Defendants Fall River County Abstract Company and SDLTA then brought suit seeking a Writ of Prohibition to prohibit the Director of Insurance from establishing these fees. Plaintiff First American Title Insurance Company intervened as a defendant. Defendants Fall River County Abstract Company and SDLTA were unsuccessful in their litigation. The court ruled that the Director of Insurance should proceed to establish a fee schedule for countersignatures.[10]

Plaintiffs allege that the purpose of this litigation was to harass and competitively injure them. This Court, however, has read the pleadings, affidavits and depositions, has heard the testimony and reviewed the evidence in the trial of this matter, and has searched the opinion in the *Fall River County Abstract Company* case. The record shows that Defendants participated in the litigation in question for the express pur-

10. This ruling was rendered ineffective in 1980 when SDCL 36–13–25 was amended to allow SDABE to establish the fee schedule for countersignatures.

pose of achieving the result which they claimed they were seeking. As with the lobbying activities noted above, the relief the Defendants unsuccessfully sought in the *Fall River County Abstract Co.* case was eventually obtained through legislation. This tends to indicate that the case was not a sham. *Subscription Television, Inc. v. Southern California Theatre Owners Ass'n,* 576 F.2d 230 (9th Cir. 1978); *Central Bank of Clayton, supra.*

Since this Court finds no factual basis to support Plaintiffs' claim that the Defendants' participation in this lawsuit was a sham, the Noerr-Pennington Doctrine also governs.

Another allegation which Defendants claim is barred by Noerr-Pennington refers to Defendants' alleged publicity campaign. (¶ 21(h) of Plaintiffs' complaint). Plaintiffs charge that Defendants participated in a publicity campaign which was ostensibly directed toward influencing governmental action, but which was in fact, a mere sham to cover an attempt to interfere with Plaintiffs' business relationships.

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight,* 365 U.S. at 144, 81 S.Ct. at 533, the Court stated that:

> There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified.

Having reviewed the trial transcript and the trial exhibits, this Court is unable to find any evidence of a "publicity campaign" that is not encompassed by the allegations contained in paragraphs 21(b), (c) and (d) of the complaint. Nor can this Court find any reference to such a "publicity campaign" in the post-trial material submitted by parties. Furthermore, because, as stated elsewhere in this opinion, this Court has found that any such "publicity campaigns" were directed towards influencing governmental action and were not merely a sham to cover attempts to interfere with Plaintiffs' business

relationships, this Court finds that the allegations set forth in ¶ 21(h) are redundant and do not properly state a claim that entitles Plaintiffs to relief under the Sherman Act.

Such finding leaves only Plaintiffs' allegation that Defendants' opposition to First American Title Insurance Company's application for a certificate of authority was a sham proceeding. In this regard, the language of *California Motor Transport, supra,* must again be examined. In that case, the Supreme Court stated:

> One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. *Id.* at 513, 92 S.Ct. at 613.

Since we are now concerned with only a single lawsuit, the question arises whether a single lawsuit can ever constitute a sham within the exception to the Noerr-Pennington Doctrine. The Supreme Court addressed this issue in *Vendo Company v. Lektro-Vend Corp.,* 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977), but established no clear precedent. In a concurring opinion, Justice Blackmun, joined by Chief Justice Burger, indicated that *California Motor Transport* stands for the proposition that a single court proceeding cannot be the basis of an exception to the Noerr-Pennington Doctrine. On the other hand, Justice Stevens, joined by Justices Brennan, White and Marshall, stated that a single suit could be the basis of an antitrust violation.

A number of lower courts have also addressed the issue and have reached conflicting results. In *Reaemco, Inc. v. Allegheny Airlines,* 496 F.Supp. 546 (S.D.N.Y.1980), and *Mountain Grove Cemetery v. Norwalk Vault Co.,* 428 F.Supp. 951 (D.Conn.1977), it was held that a single lawsuit was not sufficient evidence of a sham so as to fall within the Noerr-Pennington exception. The opposite result has been reached in other courts. *See Feminist Women's Health Center, Inc. v. Mohammad,* 586 F.2d 530 (5th Cir. 1978) *cert. denied* 444 U.S. 924,

100 S.Ct. 262, 62 L.Ed.2d 180 (1979); *Technicon Medical Information Systems Corp. v. Green Bay Packaging, Inc.*, 480 F.Supp. 124 (E.D.Wis.1979); *Colorado Petroleum Marketers Ass'n v. Southland Corp.*, 476 F.Supp. 373 (D.Colo.1979). Two district courts in the Eighth Circuit have addressed this issue and have reached conflicting results. In *Central Bank of Clayton, supra*, in finding there was no sham, the court emphasized that only one lawsuit was brought. *Id.* at 167.[11] A different opinion was expressed in *First National Bank of Omaha v. Marquette National Bank of Minneapolis*, 482 F.Supp. 514 (D.Minn.1979), wherein the court concluded that in some cases one lawsuit could be sufficient to bring a defendant's conduct within the sham exception to the Noerr-Pennington Doctrine. *Id.* at 520.

■ This Court agrees with the Minnesota District Court that in some instances one lawsuit can be sufficient to come within Noerr-Pennington's sham exception. If a lawsuit is filed solely to interfere with another's business relationships or to deny another access to a tribunal, it should not be necessary that a second, third, fourth or fifth lawsuit be filed before this conduct is considered a sham. A statement from *Colorado Petroleum, supra*, seems eminently reasonable:

> I am not convinced that the court intended to give every dog one free bite, thus making it an irrebuttable presumption that the first lawsuit was not a sham regardless of overwhelming evidence indicating otherwise.... Although the frequency of litigation is a probative factor in a putatively sham litigation situation, it is not by any means determinative. *Id.* at 378–79.

■ In light of this Court's determination that one lawsuit can be a sham for Noerr-Pennington purposes, this Court must now determine whether the appeal of the Insurance Commissioner's decision was the type of conduct which falls within the meaning and scope of the sham exception.

The Fifth Circuit, in *Feminist Women's Health Center, Inc. v. Mohammad, supra* at 543, has stated that the test for a sham exception is, "[w]hether the conduct was genuinely intended to influence a government employee to take official action in his [official] capacity...." The Ninth Circuit, in *Franchise Realty, supra*, at 1081, concluded the scope of the sham exception, "... is limited to situations where the defendant is not seeking official action by a governmental body, so that the activities complained of are 'nothing more' than an attempt to interfere with the business relationships of a competitor...." Thus, it appears that this Court must divine the Defendants' intent in appealing the decision of the Director of Insurance. In evaluating intent, it is necessary to distinguish anticompetitive intent from the intent to interfere with business relationships. In analyzing activities that fall within the sham exception to the Noerr-Pennington Doctrine, the District of Columbia Circuit Court stated in *Federal Prescription Service v. American Pharmaceutical Ass'n*, 663 F.2d 253, 263 (D.C.Cir. 1981):

> Anticompetitive intent alone is not enough. Nor is it sufficient that the persons engaged in lobbying activity also engaged in "a pattern of actions." Both factors were present in *Noerr*, in which the Court held the complained of activities were beyond the scope of the antitrust laws. What is needed in addition is proof that the lobbyists subverted the integrity of the governmental process, that they effectively barred Federal's [plaintiff's] access to these processes, or that the nature of these processes made their invocation something other than the "political activity," that was recognized by the *Noerr-Pennington-Trucking Unlimited* line of cases to be beyond the scope of the Sherman Act.

In the present case, little evidence supports Plaintiffs' claim that the Defendants have in any way barred Plaintiffs' access to governmental process. Certainly Plaintiffs

---

11. This case was affirmed by the Eighth Circuit Court of Appeals without opinion, so the court

did not specifically address the issue in question.

cannot claim they were denied access to the Director of Insurance's decision-making process. Nor can Plaintiffs claim they were denied access to the judicial process upon Defendants' appeal of the decision of the Director of Insurance. Additionally, this Court cannot find that Defendants' conduct constituted, "something other than the 'political activity,' that was recognized by the *Noerr-Pennington-Trucking Unlimited* line of cases to be beyond the scope of the Sherman Act." *Id.*

The fact that Defendants' opposition to the issuance of a certificate of authority by the Director of Insurance was unsuccessful is not and should not be determinative of intent. In a memorandum decision dated January 10, 1979, Judge Robert Miller of the South Dakota Sixth Judicial Circuit affirmed the decision of the Director of Insurance, finding that the Director's determinations were supported by the record as a whole. Judge Miller also found that several of the issues raised by the appeal were outside the jurisdiction of the Director and thus the Director's refusal to rule on those issues was proper. This Court has been unable to find any statement in Judge Miller's memorandum opinion that would indicate that the appeal of the Director's decision was a sham or was frivolously made in order to interfere with Plaintiffs' business relationships. It appears to this Court that Defendants intended to and did make a genuine effort to influence an official administrative decision and, when unsuccessful in those efforts, Defendants made a genuine effort to seek judicial review of the Director's decision. Such a finding does not mean that Plaintiffs have not been injured in some way as an incidental effect of Defendants' efforts. The Sherman Act, however, does not proscribe such incidental effects because, as the Court stated in *Eastern Railroad Presidents Conference v.*

*Noerr Motor Freight*, 365 U.S. at 143, 81 S.Ct. at 533:

> It is inevitable, whenever an attempt is made to influence legislation by a campaign of publicity, that an incidental effect of the campaign may be the infliction of some direct injury upon the interests of the party against whom the campaign is directed. And it seems equally inevitable that those conducting the campaign would be aware of, and possibly even pleased by, the prospect of such injury. To hold that knowing infliction of such injury renders the campaign itself illegal would thus be tantamount to outlawing all such campaigns.

The Court then concluded that such campaigns had not been outlawed by the Sherman Act. *Id.* at 144, 81 S.Ct. at 533. The Court's analysis of the basic nature of the case in *Noerr* is relevant to the present case:

> ... A "no-holds-barred fight" [footnote omitted] between two industries both of which are seeking control of a profitable source of income. [Footnote omitted.] Inherent in such fights, which are commonplace in the halls of legislative bodies, is the possibility, that one group or the other will get hurt by the arguments that are made. In this particular instance, each group appears to have utilized all the political powers it could muster in an attempt to bring about the passage of laws that would help it or injure the other. But the contest itself appears to have been conducted along lines normally accepted in our political system .... *Id.*

In conclusion, this Court finds that the allegations contained in ¶¶ 21(b), (c), (d), and (h) of Plaintiffs' complaint are barred by the Noerr-Pennington Doctrine.[12]

**12.** It has been stated where there is official participation in an anti-competitive lobbying scheme meant to restrain trade, Noerr-Pennington is not applicable. *Duke & Company, Inc. v. Foerster*, 521 F.2d 1277 (3rd Cir. 1975). Because SDABE, a state agency, is a party and because all of Plaintiffs' allegations are directed toward all the Defendants, it might be argued that Noerr-Pennington is inapplicable because it is alleged there is official participation in the lobbying and litigation efforts discussed above. This Court does not find that any of Plaintiffs' allegations which it has found barred by Noerr-Pennington involve the degree of official participation necessary under the decision in *Foerster*, and other similar cases.

## STATE ACTION DOCTRINE

The so-called state action doctrine was formulated by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), in which it was held that Congress did not intend the Sherman Act to apply to state action. The Court stated: "We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature." *Id.* at 350–51, 63 S.Ct. at 313. The Supreme Court did not address the state action doctrine for thirty years until it decided the case of *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), which ruled on the use of minimum fee schedules for attorneys. Since that time, several Supreme Court decisions have considered this doctrine. *See California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *City of Lafayette, La. v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1970); *Cantor v. Detroit Edison Company*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976).[13]

In *Midcal, supra*, the Supreme Court established standards for antitrust immunity under *Parker*.[14] These standards were stated as follows: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy;' second, the policy must be 'actively supervised' by the State itself." The Eighth Circuit Court of Appeals also studied the state action doctrine and discussed when it should be applied. In *Sound, Inc. v. American Telephone & Telegraph Company*, 631 F.2d 1324 (8th Cir. 1980), the Court held that the following factors were relevant in determining whether the state action doctrine should be applied:

[t]he existence and nature of any relevant statutorily expressed policy; the nature of the regulatory agency's interpretation and application of its enabling statute, including the accommodation of competition by the regulator; the fairness of subjecting a regulated private defendant to the mandates of antitrust laws; and the nature and extent of the State's interest in the specific subject of the challenged activity. *Id.* at 1334.

Defendants argue that Plaintiffs' allegations concerning fixing the price of abstractor countersignatures and enforcing countersignature and title plant requirements are covered by the *Parker* case.[15] They assert that state policy regarding these subjects is clearly articulated in SDCL 36–13 and 58–25 and that these subjects are actively supervised by the state.

Plaintiffs argue that a state agency, SDABE, is involved in the conspiracy, and thus, the state action doctrine should not be applicable. There is some support for this position. In *Duke & Company v. Foerster*, 521 F.2d 1277 (3rd Cir. 1975), the court stated:

After *Goldfarb* . . . it is clear that when there is an allegation of governmental participation in such a combination to the benefit or detriment of private parties, and when the activities of the public body are not compelled by the state acting as a sovereign, a claim has been stated under the antitrust laws. *Id.* at 1282. *See also Lafayette, supra; Kurek v. Pleasure Driveway and Park District of Peoria, Ill.*, 557 F.2d 580 (7th Cir. 1977), *vacated*

---

**13.** For a more complete discussion of the development of the state action doctrine and a closer look at the cases interpreting it, *see, Sound, Inc. v. American Telephone & Telegraph Company*, 631 F.2d 1324, 1332–34 (8th Cir. 1980).

**14.** Actually *Parker, supra*, did not establish an immunity under the antitrust laws, but instead, established a limitation on the scope of these laws. However, this Court, like most others, will make use of the term immunity.

**15.** The allegations which Defendants contend would be immune under *Parker* are those contained in ¶¶ 21(e), (f), and (g). Although this Court has already determined that the allegation in ¶ 21(e) is barred by the McCarran-Ferguson Act, the effect of *Parker* on this allegation will also be discussed.

and *remanded* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364, *aff'd* 583 F.2d 378 (7th Cir. 1978), *cert. denied* 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979).

As noted earlier, Plaintiffs have alleged, in ¶ 21(g) of the complaint, that Defendants conspired to enforce and attempted to enforce ARSD § 20:36:04:01 and that this regulation is illegal and anticompetitive as applied to Plaintiffs. This regulation was adopted by the SDABE pursuant to SDCL 36–13–10 and 36–13–6. SDCL 36–13–10 specifically authorizes the SDABE to promulgate rules and regulations for the establishment of abstract plants. If, as Plaintiffs allege, the regulation was enacted by SDABE in order to specifically prevent Plaintiffs from establishing abstract plants in counties other than Pennington County, then this would appear to be the kind of government action that would preclude the application of the state action doctrine. However, if the regulation was adopted in an effort to promote the public welfare and in furtherance of a statutorily expressed public policy, then the state action doctrine will bar Plaintiffs' action concerning ARSD § 20:36:04:01. Thus, this Court must determine whether the tests set out by the Supreme Court in *Midcal, supra,* and by the Eighth Circuit Court of Appeals in *Sound, Inc., supra,* have been met.

The SDABE was created by the State Legislature by the enactment of SDCL 36–13. The composition of the board and the requisite qualifications of its members were determined by the State Legislature in SDCL 36–13–1. The duties of the SDABE were established in SDCL 36–13–6 and include carrying out the purposes and enforcing the provisions of the chapter. SDCL 36–13–6 also clearly requires the SDABE to, "... make such rules and regulations as may be necessary to carry out the purposes of this chapter." *Id.* SDCL 36–13–6 also requires the Board to comply with the state Administrative Procedures Act when making rules and regulations. Additionally, SDCL 36–13–8 and 36–13–10 specifically refer to the Board's rule-making authority.

The South Dakota Legislature, in SDCL 36–13–10, has clearly expressed state policy concerning the need for a person engaging in the business of abstracting to have an abstract plant. That statute also indicates the state's interest in having such abstract plants contain sufficient information to show, "... all instruments affecting the title to real estate which are of record or on file in the office of the registrar of deeds of each county...." *Id.* SDCL 36–13, taken as a whole, clearly indicates the state's policy requiring the regulation of the business of abstracting.

The South Dakota Supreme Court, in *Siefkes v. Clark Title Company,* 88 S.D. 81, 215 N.W.2d 648, 652 (1974), recognized the state's interest in regulating the business of abstracting. The Court therein stated that, "[b]ecause the abstractor's product is an indispensable part of real property transfers and due to the reliance which must necessarily be placed upon it by the vendor and vendee alike, the legislature has properly exercised its police power by the enactment of SDCL 36–13." *Id.*

ARSD § 20:36:04:01, the regulation complained of in ¶ 21(g) of the complaint, further implements state policy and clarifies the statutory language of SDCL 36–13–10. The statute requires, "... indexes or other records showing in a *sufficiently comprehensive form,* all instruments affecting title ...." *Id.* [Emphasis added.] The requirements set out in the regulation that Plaintiffs have complained of have the effect of increasing the accuracy of abstract plant records. Such a result clearly supports the state's policy of regulating abstractors. Nor does the SDABE's interpretation and application of its enabling statutes, regarding the enactment of ARSD § 20:36:04:01, appear unreasonable or strained.

While this regulation might increase the amount of work required to construct an abstract plant or prepare one for sale or transfer, such a burden falls on anyone wishing to purchase or construct an abstract plant in South Dakota and not just on Plaintiffs.

It also appears, from the depositions of Arthur Johnson, at page 12 and Barbara Mann, at pages 11 and 42, that especially since 1975 the state's policies concerning abstract plants have been actively enforced. Since 1975 approximately 20 to 25 new and existing abstract plants have been examined by the SDABE pursuant to regulations promulgated by the Board.

In *Fed. Prescription Service v. American Pharmaceutical Ass'n, supra,* Plaintiffs alleged that the Iowa State Board of Pharmacy Examiners had conspired with, among others, the Iowa State Pharmaceutical Association. As in the present case, the Iowa Board of Pharmaceutical Examiners was, by statute, composed of pharmacists who were members of the State Pharmaceutical Association. It was also possible to argue that some of the Iowa Board's actions were taken to competitively injure the Plaintiffs. The Board could also have taken the same actions believing them to be for the public good. A similar problem is raised by the arguments in the present case. The District of Columbia Circuit Court of Appeals applied the following analysis:

> Accepting as true that the board members acted in conformance with American's economic goals rather than solely in selfless dedication to the public good, we decline, given the availability of a better explanation for their conduct, to treat that parallel conduct as significant probative evidence of an unlawful conspiracy with American. Although parallel behavior may support an inference of conspiracy when the alleged co-conspirators have acted in a way inconsistent with independent pursuit of economic self-interest, that inference is warranted only when a theory of rational, independent action is less attractive than that of concerted action. [Citations omitted.] The behavior of the Iowa Board in this case is not the kind that could only make sense in the context of the behavior of others; rather, it can be persuasively explained by the exercise of rational, independent judgment. If we take as true Federal's claim that the Board was dominated by community pharmacists pursuing commercial self-interest, then the Board's action in attempting to hinder Federal's operation is explained as simply an effort to serve the economic interests of the Board members and their professional peers. If instead Federal is wrong and the Board was actually seeking in good faith to advance the public interest, the inference that it unlawfully conspired with American is weaker yet. We thus conclude that the most convincing explanations of the Board's conduct do not support the theory that Board members were participants in an unlawful conspiracy with American. *Federal Prescription Service v. American Pharmaceutical Ass'n,* 663 F.2d at 267.

The Plaintiffs have also claimed that the SDABE is the "alter ego" of SDLTA and thus the actions of the SDABE should not be subject to the state action doctrine. In support of this argument, Plaintiffs note that three of the four members of the SDABE were also members of the SDLTA. While this Court understands Plaintiffs claim that the overlapping membership between SDABE and SDLTA should be probative of a conspiracy, given the facts of this case, this Court concludes "mere membership in associations is not enough to establish participation in a conspiracy with other members of those associations...." *Id.* at 265.

The SDABE was established by SDCL 36–13. The statute provides that of the four members of the Board, three will be active abstractors. Currently, SDCL 36–13–1 requires two of the three abstractor members to be members of SDLTA. Thus, the composition of the SDABE has been determined by state law and any changes that should be made are a matter for the state legislature. Any such changes should not be made by this Court applying the Sherman Act as a substitute for the proper political process.

Further, the Plaintiffs have been unable to show that SDABE and SDLTA engaged in a conspiracy resulting in the enactment of ARSD § 20:36:04:01. Plaintiffs have

been unable to show that the SDABE violated SDCL 36–13–6 or SDCL 1–26 when ARSD § 20:36:04:01 was enacted. Instead, the evidence shows that SDABE complied with the requirements of the South Dakota Administrative Procedures Act when enacting the ARSD § 20:36:04:01.

Finally, Plaintiffs have not shown that their theory of the reason for the enactment of ARSD § 20:36:04:01 is more plausible than the Defendants' explanation. Thus, as did the District of Columbia Circuit Court in *Federal Prescription Service, supra,* this Court must, "conclude that the most convincing explanations of the Board's conduct do not support the theory that the Board members were participants in an unlawful conspiracy...." *Id.* at 268.

Thus, when all of the evidence is analyzed in accordance with the factors set out by the Eighth Circuit Court of Appeals in *Sound, Inc. v. American Telephone and Telegraph Company, supra,* and considering the analysis of the D. C. Circuit Court of Appeals in *Federal Prescription Service,* this Court finds that the state action doctrine precludes the application of the Sherman Act to the actions complained of in ¶ 21(g) of the Plaintiffs' complaint.

■ This same reasoning applies to the allegations concerning the establishment of fees for countersignatures on title insurance policies (¶ 21(f) of Plaintiffs' complaint.) The South Dakota State Legislature has declared that countersignatures are required on title insurance policies, SDCL 58–25–16, and that the SDABE is to, "... establish a schedule of fees ... for an abstractor's services for countersigning title insurance policies pursuant to § 58–25–16." SDCL 36–13–25. This Court finds these statutes to be a clear expression of state policy. The South Dakota Supreme Court has also recognized that the legislature is concerned with price regulation of the abstracting business. *Siefkes v. Clark Title Company, supra.* It also appears to this Court that the statutorily expressed policy concerning the establishment of fee schedules by the SDABE and the requirement of

countersignatures on title insurance policies, has been actively enforced. The SDABE filed rules concerning countersignature requirements with the South Dakota Secretary of State on July 12, 1981. While the SDABE has not established a fee schedule for countersignatures of title insurance policies, it has held informational hearings regarding such fees in the cities of Aberdeen, Mitchell and Rapid City, South Dakota. These meetings were held in March and April of 1981. (Deposition of Barbara Mann, p. 223; Trial Exhibit 86.) Having reviewed the actions taken by the SDABE pursuant to SDCL 58–25–16 and SDCL 36–13–25, this Court can find no fault with the SDABE's interpretation of the enabling statutes. Nor can this Court, when reviewing the evidence as a whole, find that the SDABE participated in a scheme specifically designed to damage Plaintiffs' business interests. Thus, considering both the *Midcal* test and the factors set out by the Eighth Circuit Court of Appeals in *Sound, Inc., supra,* this Court concludes that the state action doctrine bars ¶ 21(f) of Plaintiffs' complaint.

■ One remaining allegation which Defendants claim is barred by the state action doctrine concerns the enforcement and attempts to enforce SDCL 58–25–16. (¶ 21(e) of Plaintiffs' complaint.) The challenged restraint, namely the requirement that title insurance policies be signed by abstractors, is "clearly articulated and affirmatively expressed as state policy." The legislature clearly stated in SDCL 58–25–16 that title insurance policies should be countersigned. It also appears that the statute itself indicates that this particular alleged restraint is "actively supervised" by the state. Applying the standards articulated in *Midcal* and *Sound, Inc.,* this Court concludes that the allegation in ¶ 21(e) is also barred by the state action doctrine.

Defendants SDABE and State of South Dakota finally argue that they are immune from this suit under the eleventh amendment,[16] citing as authority *Quern v. Jordan,*

---

**16.** The eleventh amendment provides: "The Ju-       dicial power of the United States shall not be

440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) and *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Because this action has been resolved without reaching Defendants' eleventh amendment argument, that question will not be addressed by the Court.

### CONCLUSION

In summary, this Court has determined the following:

(1) The allegations contained in ¶ 21(e) of Plaintiffs' complaint are barred by the McCarran-Ferguson Act.

(2) The allegations contained in ¶¶ 21(b), (c), (d), and (h) of Plaintiffs' complaint are barred by the first amendment and the Noerr-Pennington Doctrine.

(3) The allegations contained in ¶¶ 21(e), (f) and (g) of Plaintiffs' complaint are barred by the state action doctrine.

(4) The Defendants are not liable to the Plaintiffs for the conduct alleged in ¶ 21(a) of Plaintiffs' complaint for the reason that the Plaintiffs have not by sufficient evidence established the conspiracy alleged.

The above constitutes this Court's findings of fact and conclusions of law in this matter.

construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State."