714 F.2d 1439
 1983-2 Trade Cases P 65,539
 FIRST AMERICAN TITLE COMPANY OF SOUTH DAKOTA and First
American Title Insurance Company of South Dakota, Appellants,
v.
SOUTH DAKOTA LAND TITLE ASSOCIATION, South Dakota
Abstracter's Board of Examiners, Black Hills Land and
Abstract Company, Dennis O. Murray, Security Land and
Abstract Company, Glen M. Rhodes, Fall River County Abstract
Company, Charles E. Clay, Custer Title Company, Betty J.
Gould, Haakon County Abstract Company, Keith Emerson, Wayne
Roe, and Charles Nass, Appellees.
 No. 82-1753.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 16, 1983.
Decided August 11, 1983.
 
 1
 Lynn, Jackson, Shultz & Lebrun, P.C., Donald R. Shultz, Gene N. Lebrun, Rapid City, S.D., Burns & Figa, P.C., Hugh A. Burns, Phillip S. Figa, Denver, Colo., for appellants.
 
 
 2
 Mark V. Meierhenry, Atty. Gen., Jeffrey P. Hallem, Asst. Atty. Gen., Pierre, S.D., for state appellees.
 
 
 3
 Schmidt, Schroyer, Colwill & Zinter, P.C., Gary F. Colwill, Ronald G. Schmidt, Pierre, S.D., for appellees South Dakota Land Title Ass'n, Fall River Abstract Co., Charles E. Clay, Custer Title Co., Betty J. Gould, Haakon County Abstract Co., Keith Emerson, Wayne Roe and Charles Nass.
 
 
 4
 Before HEANEY and FAGG, Circuit Judges, and HANSON,* Senior District Judge.
 
 
 5
 HANSON, Senior District Judge.
 
 
 6
 This antitrust case concerns alleged anticompetitive private and regulatory restraints on the South Dakota abstracting and title insurance businesses. Plaintiffs/appellants, First American Title Company of South Dakota and First American Title Insurance Company of South Dakota, contend that they were the victims of a price-fixing conspiracy, frivolous and sham litigation, and a conspiracy to devise and enforce statutes and regulations which served to restrain trade in the abstracting and title insurance businesses, all in violation of sections 1 and 2 of the Sherman Act.[1] 15 U.S.C. §§ 1 and 2. Defendants/appellees are the South Dakota Land Title Association (the Association), a professional association of South Dakota abstracters; the South Dakota Abstracters' Board of Examiners (the Board of Examiners), the state board which regulates the business of abstracting; and various individual South Dakota abstracters and title companies. The district court also permitted the joinder of the State of South Dakota as a defendant pursuant to a motion by the Board of Examiners.
 
 
 7
 Following a bifurcated bench trial on the issue of liability, the district court entered judgment for defendants. The court found that there was insufficient evidence to support a conclusion that a private price-fixing conspiracy existed among defendant abstracters and their title companies. The court further concluded that plaintiffs' remaining antitrust claims were barred by the McCarran-Ferguson Act, the Noerr-Pennington doctrine, and the state action doctrine. The First American companies appeal these holdings and we affirm.
 
 I.
 A.
 
 8
 South Dakota pervasively regulates the business of abstracting and insuring land titles. See SDCL chs. 36-13 (Abstracters of Title) and 58-25 (Title Insurance Rates and Policies). Until July 1, 1979, South Dakota required that no foreign insurance company could issue a title insurance policy on property in South Dakota unless the policy was countersigned by a licensed abstracter who was doing business in the county where the property was located. SDCL § 58-25-16.[2]
 
 
 9
 In order to do business in a particular county in South Dakota, an abstracter, among other requirements, must have an approved abstract plant showing "in a sufficiently comprehensive form, all instruments affecting the title to real estate which are of record or on file in the office of the register of deeds...." SDCL § 36-13-10. The Board of Examiners, whose duty it is to "carry out the purposes and enforce the provisions of" the statutes governing abstracting and to "make such rules and regulations as may be necessary to carry out the purposes of those statutes," SDCL § 36-13-6, defines by regulation what constitutes "sufficiently comprehensive form" for an abstract plant's records. In part, this long-standing regulation requires that the plant contain
 
 
 10
 a complete index showing every instrument recorded in the register of deeds' office in the county wherein [the abstracter] proposes to operate, properly listed against the specific property which it affects, and also a separate index showing all recorded instruments which do not affect specific property. This index ... must be made from an actual check of each page of each book of recorded instruments in said office, and in no case will a copy or film of the numerical index in the register's office be accepted.
 
 
 11
 ARSD § 20:36:04:01.
 
 
 12
 One of the First American companies' contentions is that the requirement that an abstracter's index be "made from an actual check of each page of each book of recorded instruments" imposes a financially-prohibitive burden upon anyone who wishes to open a competing abstract plant in a given county. See Part IV infra. The regulation's anticompetitive effect, according to appellants, is reflected by the current situation in South Dakota in which most counties have only one licensed abstracter, except for the more populated counties, which have two.
 
 B.
 
 13
 Walter J. Linderman became a licensed abstracter in Pennington County, South Dakota in 1973 and formed First American Title Company of South Dakota in 1974. Linderman's title company served as a local agent for a foreign title insurance company, First American Title Insurance Company of California. In his dual capacity as abstracter and title insurance agent, Linderman was qualified to countersign title insurance policies on property located in Pennington County; but in insuring title on property outside Pennington County, Linderman was required to obtain the countersignature of that county's licensed abstracter and pay the resulting fee.
 
 
 14
 The anomoly in SDCL § 58-25-16 which required only foreign insurance companies to obtain countersignatures from abstracters on title insurance policies led Linderman to form a domestic title insurance company in December 1978--First American Title Insurance Company of South Dakota. This would have enabled Linderman to issue title insurance policies on property in any South Dakota county without obtaining a countersignature from that county's licensed abstracter.
 
 
 15
 This was not to be, however, because in the ensuing legislative session, the South Dakota legislature amended SDCL § 58-25-16 by deleting the word "foreign," thus extending the countersignature requirement to all title insurance policies, whether they be issued by a foreign or domestic insurance company.[3]
 
 
 16
 Defendants' opposition to Linderman's formation of a domestic title insurance company and their support for the amendments to § 58-25-16 form bases for two of the First American companies' antitrust claims. It is claimed that defendants engaged in frivolous and sham litigation in violation of the Sherman Act by appealing to state court the administrative decision by the Division of Insurance to grant a certificate of authority to First American Title Insurance Company of South Dakota. It is further claimed that defendants engaged in unlawful anticompetitive conduct by lobbying in support of the amendments to § 58-25-16, which included the deletion of the word "foreign" from the statute.
 
 
 17
 Following the amendment to the countersignature statute, the alleged anticompetitive conspiracy continued in 1979 in the context of a controversy over whether the Division of Insurance or the Board of Examiners had the authority to set countersignature fees. The Board of Examiners already had at that time clear authority to "establish a schedule of fees for doing business" under chapter 36-13 relating to abstracters' services. SDCL § 36-13-25. The countersignature requirement, however, is in chapter 58-25, which regulates title insurance, a business overseen by the Division of Insurance and its director. SDCL § 58-2-21. The First American companies claim that defendants wanted the Board of Examiners to control countersignature fees to insure that they would be sufficiently high to stem the proliferation of title insurance in South Dakota. Presumably, the Board of Examiners' interest in setting high fees would be greater because three of its four members are required to be abstracters. SDCL § 36-13-1.
 
 
 18
 Following an opinion by the South Dakota Attorney General that the Division of Insurance had authority to set counter-signature fees, the Association brought an ultimately unsuccessful state court action attacking the jurisdictional basis for this authority. Fall River County Abstract Company v. Knutson, (6th Judicial Circuit Court, Hughes County, S.D., November 6, 1979, Judge Robert A. Miller). A basis for the state court ruling was the conclusion that the countersigning of a title insurance policy was purely a ministerial act because South Dakota law did not require any affirmative act by the abstracter before signing. During the 1979 South Dakota legislative session, defendants successfully lobbied the state legislature to pass laws which ensured that the countersigning of a title insurance policy was to be more than a ministerial act and which specifically gave the Board of Examiners the authority to set countersignature fees.[4] The litigation and lobbying by defendants on the countersignature fee issue are alleged to be further unlawful anticompetitive acts.
 
 
 19
 Although the Board of Examiners did in 1980 obtain authority to establish countersignature fees, no fee schedule ever regulated countersignature fees during the life of the First American Title Insurance Company of South Dakota. It is claimed that Linderman, as the agent for this company, was the victim of a private price-fixing conspiracy by the individually-named defendant abstracters and title companies in 1979 and 1980. Allegedly, these defendants conspired to fix countersignature fees at a level of 50% of the title insurance policy's premium. It is claimed that this private price-fixing conspiracy, coupled with the statutory changes, forced Linderman to dissolve First American Title Insurance Company of South Dakota in May 1980.
 
 II.
 
 20
 First American's[5] initial claim on appeal--that the district court erred in finding insufficient evidence of a private conspiracy to fix prices for countersignature fees--need not long detain us. It is, of course, well-established that price-fixing is a per se violation of § 1 of the Sherman Act. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218, 60 S.Ct. 811, 841, 84 L.Ed. 1129 (1940). In this case the district court concluded that evidence of a conspiracy to fix countersignature fees at 50% of the title insurance policy premium was "equivocal" and "not sufficient." First American failed to prove the presence of a conspiracy among the individual abstracters and title companies named as defendants, and further failed to prove that the countersignature fees charged by these defendants were fixed at a level of 50% of the policy premium. It would serve no purpose for this court to reiterate the district court's discussion which reflects careful consideration of the evidence. See First American Title Co. v. South Dakota Land Title Association, 541 F.Supp. 1147, 1154-56 (D.S.D.1982). We hold that substantial evidence in the record supports the district court's findings; nowhere are we left with the "definite and firm conviction that a mistake has been committed" with regard to these findings. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).
 
 III.
 
 21
 First American next contends that the district court erred in holding that the Noerr-Pennington doctrine insulates defendants from antitrust liability for their lobbying and litigation activities. The Noerr-Pennington doctrine generally holds that the Sherman Act does not apply to joint efforts by groups seeking to exercise their first amendment right to petition the government, whether it be a petition to the legislature, an administrative agency, or the courts. California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern Railroad Conference v. Noerr Motor Freight, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). Furthermore, such joint efforts "do not violate the antitrust laws even though intended to eliminate competition." Pennington, supra, 381 U.S. at 670, 85 S.Ct. at 1593. But an exception to the doctrine does hold that the Sherman Act applies if the joint action "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." Noerr Motor Freight, supra, 365 U.S. at 144, 81 S.Ct. at 533.
 
 A.
 
 22
 First American initially attacks the district court's holding that lobbying by defendants in favor of the amendment to SDCL § 58-25-16 which resulted in deletion of the word "foreign" from the statute was activity which fell "squarely within the confines of the Noerr-Pennington Doctrine." First American Title Co., supra, 541 F.Supp. at 1157. We do not understand First American to argue the sham exception in attacking this holding. Indeed, such a claim would not prevail. As the district court concluded, "This is a classic case of a group of persons petitioning their government for relief and receiving the relief they request." Id. Cf. Alexander v. National Farmers Organization, 687 F.2d 1173, 1195 (8th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 2108, 2110, 77 L.Ed.2d 313, 314 (1983) ("The sham exception generally involves governmental contacts which are not a genuine attempt to influence official decision making, but instead are merely an attempt to interfere directly with the business relationships of a competitor.").
 
 
 23
 Rather First American claims that the Noerr-Pennington doctrine does not apply because a state agency--the Board of Examiners--was an alleged conspirator along with the private party defendants in seeking amendment to the countersignature statute. First American relies on Duke & Co. v. Foerster, 521 F.2d 1277, 1281-82 (3d Cir.1975), in arguing for application of this coconspirator exception to the Noerr-Pennington doctrine. In Duke & Co., plaintiff alleged that municipal corporations which owned the Pittsburgh Civic Arena, Three Rivers Stadium, and the Pittsburgh International Airport conspired with private corporations which operated these facilities to boycott malt beverages manufactured by plaintiff. The court of appeals reversed the district court's dismissal of the complaint, holding in part that the Noerr-Pennington doctrine did not shield defendants from antitrust liability.
 
 
 24
 Both Noerr and Pennington involved suits against private parties who had allegedly conspired to influence governmental action. In neither case was it alleged that the governmental entity had collaborated to promote the conspiracy. Where the complaint goes beyond mere allegations of official persuasion by anticompetitive lobbying and claims official participation with private individuals in a scheme to restrain trade, the Noerr-Pennington doctrine is inapplicable.
 
 
 25
 Duke & Co., supra, 521 F.2d at 1282 (emphasis in original).
 
 
 26
 We do not quarrel with the court's conclusion in Duke & Co. that the Noerr-Pennington doctrine did not apply. In our view, however, Noerr-Pennington was inapplicable because of the nature of the conduct alleged in the complaint, not because of the nature of the parties involved.[6] The anticompetitive conduct alleged in the complaint in Duke & Co. was a boycott of plaintiff's product; clearly an alleged anticompetitive boycott is not first amendment conduct which the Noerr-Pennington doctrine was formulated to protect. The Court made this distinction in Noerr Motor Freight.
 
 
 27
 We think it equally clear that the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly.... [S]uch associations ... bear very little if any resemblance to the combinations normally held violative of the Sherman Act, combinations ordinarily characterized by an express or implied agreement or understanding that the participants will jointly give up their trade freedom, or help one another to take away the trade freedom of others through the use of such devices as price-fixing agreements, boycotts, market-division agreements, and other similar arrangements.
 
 
 28
 Id., 365 U.S. at 136, 81 S.Ct. at 529. Thus the Court made clear that "[t]he proscriptions of the Act, tailored as they are for the business world, are not at all appropriate for application in the political arena." Id., 365 U.S. at 141, 81 S.Ct. at 531. Duke & Co. and the instant case are embodiments of the Court's distinction. Whereas Duke & Co. involved allegations of anticompetitive government activity in the business world, the instant case concerns government activity in the political arena. We therefore hold that Duke & Co. is distinguishable on its facts.
 
 
 29
 First American further contends that defendants' lobbying campaign should not be protected by Noerr-Pennington because it involved "a misuse of the lobbying process" through false statements and inaccuracies that were made by defendants to the state legislature. The focus of this complaint appears to be a letter that the Board of Examiners sent to members of the South Dakota legislature explaining the Board's understanding of the then-current requirements for becoming a licensed abstracter and stating the Board's fear that failure to amend the countersignature statute could conceivably result in a domestic title insurance company issuing policies without performing a title search. The district court made no specific findings in this regard, but to characterize these statements as "misrepresentations" and to withhold Noerr-Pennington protection on account of this would result in undermining the doctrine itself. This letter, which contained at most mild political hyperbole, was well within the bounds of traditional political activity which Noerr-Pennington was established to protect. Cf. Westborough Mall, Inc. v. City of Cape Girardeau, 693 F.2d 733, 746 (8th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983) (holding that illegal or fraudulent actions employed in conjunction with legitimate lobbying went beyond traditional political activity protected by Noerr-Pennington ).
 
 
 30
 Even assuming that misrepresentations may have appeared in the Board's letter, this would not preclude application of the Noerr-Pennington doctrine--at least in the context of legislative lobbying. The Supreme Court in California Motor Transport made the following comments regarding the bounds of constitutionally-protected conduct in the political arena:
 
 
 31
 The political campaign operated by the railroads in Noerr to obtain legislation crippling truckers employed deception and misrepresentation and unethical tactics. We said:
 
 
 32
 "Congress has traditionally exercised extreme caution in legislating with respect to problems relating to the conduct of political activities, a caution which has been reflected in the decisions of this Court interpreting such legislation. All of this caution would go for naught if we permitted an extension of the Sherman Act to regulate activities of that nature simply because those activities have a commercial impact and involve conduct that can be termed unethical." 365 U.S., at 141 [81 S.Ct. at 531].
 
 
 33
 Id. 404 U.S. at 512, 92 S.Ct. at 612.
 
 
 34
 Finally, we note that First American had equal access to the legislature to lobby against the amendment and to correct any "misrepresentations" which may have been made by defendants. Accordingly, we hold that the district court properly applied the Noerr-Pennington doctrine to defendants' activities in lobbying the South Dakota legislature to amend the countersignature statute.
 
 B.
 
 35
 First American also attacks the district court's application of the Noerr-Pennington doctrine to the state court litigation which arose during the period when Linderman formed and operated his domestic title insurance company. First American claims that certain defendants in two instances engaged in baseless and sham litigation intended to harass and interfere with First American's business relations. The Association opposed the granting of a certificate of authority by the Division of Insurance to First American Title Insurance Company of South Dakota and appealed the subsequent grant of the certificate to state court. This appeal resulted in affirmance of the Division of Insurance's decision to grant the certificate. Also, in Fall River County Abstract Co. v. Knutson, supra, the Association and the Fall River County Abstract Company sought a writ of prohibition in state court to prohibit the director of the Division of Insurance from establishing a fee schedule for the countersigning of title insurance policies. First American Title Insurance Company of South Dakota intervened in this litigation as a defendant. The district court held that the Noerr-Pennington doctrine protected the Association and the Fall River County Abstract Company from antitrust liability for their participation in these actions.
 
 
 36
 It is established that "[t]he right of access to the courts is indeed but one aspect of the right of petition"; accordingly, groups do not violate the Sherman Act by "us[ing] the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors." California Motor Transport, supra, 404 U.S. at 510-11, 92 S.Ct. at 611-12. The sham exception to this doctrine holds that litigation of baseless claims which "may be characterized as a sham cover for what is really just an attempt to directly interfere with the business relations of a competitor," is subject to scrutiny under the Sherman Act. Alexander v. National Farmers Organization, supra, 687 F.2d at 1200; see California Motor Transport, supra, 404 U.S. at 513, 92 S.Ct. at 613.
 
 
 37
 In Alexander v. National Farmers Organization, supra, the parties initiated reciprocal antitrust actions arising out of competition in the milk industry between the NFO and certain large midwest dairy cooperatives. The court held that certain lawsuits initiated by the other dairy cooperatives against NFO were not actionable under the antitrust laws by application of the Noerr-Pennington doctrine, even though "the litigation directly against NFO was intended in part to hamper NFO's ability to compete." Id., 687 F.2d at 1200. The court concluded that "[t]here were genuine disputes regarding NFO's solicitation methods," id.; thus the sham exception did not apply.
 
 
 38
 Similarly in this case we do not doubt that the litigation was intended in part to hamper First American's ability to carry on the title insurance business with a domestically-formed company. But both causes of action also involved genuine disputes. The controversy over who was the proper party to establish a countersignature fee schedule was certainly genuine. When the Association lost in the judicial forum, it continued to assert its position before the South Dakota legislature and ultimately achieved the result it sought--the Board of Examiners was vested with authority to establish the fee schedule.
 
 
 39
 Likewise, the Association's effort to prevent Linderman's domestic title insurance company from receiving a certificate of authority to operate in South Dakota was not a baseless claim or sham cover for an attempt to interfere with First American's business.[7] The Association had a genuine interest in preventing a domestic title insurance company from operating in South Dakota--at least while South Dakota law had the effect of permitting a domestic insurance company to issue title insurance policies without securing a title search from an abstracter who was licensed in the county where the property to be insured was located.[8] Clearly the Association had a first amendment right of access both to the administrative and the judicial forums to press its opposition. We discern no abuse of these processes which was intended to produce an illegal result. Cf. California Motor Transport, supra (in which the Court held that the sham litigation exception applied to allegations that defendants abused administrative and judicial processes to produce the illegal result of barring plaintiffs from access to the agencies and courts). We thus affirm the district court's application of the Noerr-Pennington doctrine to these litigation episodes.
 
 IV.
 
 40
 First American also challenges the district court's application of the state action doctrine of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). First American's rather unclear claims in its complaint state that defendants violated the Sherman Act by "enforc[ing] and attempt[ing] to enforce" the countersignature statute (SDCL § 58-25-16) and the regulation setting out the requirements for an abstract plant (ARSD § 20:36:04:01), as well as that defendants violated the Sherman Act by attempting to establish a fee schedule for countersignatures pursuant to SDCL § 36-13-25. The district court held that these particular claims were barred from federal antitrust scrutiny on account of the state action doctrine under which federal law impliedly defers to "state action" when the state program at issue satisfies certain requirements. P. Areeda & D. Turner, Antitrust Law p 207 at 58 (1978).
 
 
 41
 It appears, however, that First American shifted its focus somewhat during the course of the district court proceedings by dropping its challenge to defendants' authority to establish a countersignature fee schedule and arguing that the Sherman Act preempts the countersignature statute and certain regulations. See Clerk's Record (C.R.) at 74-75. The district court did not address this particular argument. The challenged regulations are those setting out the abstract plant requirements (ARSD § 20:36:04:01), requiring the abstracter to search both the official records and the abstracter's title plant before countersigning a title insurance policy (ARSD § 20:36:07:01), and requiring that the search on behalf of a title insurer be made under the direction of the licensed abstracter (ARSD § 20:36:07:02).
 
 
 42
 First American claimed before the district court that the challenged statute and regulations produce the following anticompetitive effect. The challenged provisions impose a rigorous abstract plant requirement which must be satisfied in each county in which an abstracter seeks to be licensed to do business. ARSD § 20:36:04:01. Coupled with this is the countersignature requirement, which states that a title insurance policy must be countersigned by an abstracter who is licensed in the county where the property to be insured is located. SDCL § 58-25-16. Because First American has satisfied the state's abstract plant requirements only in Pennington County, the anticompetitive effect is to prevent First American from performing title searches on a statewide basis, which in turn prevents First American from countersigning title insurance policies on a statewide basis.
 
 
 43
 First American reiterates this argument on appeal and adds that a further anticompetitive result of the regulatory scheme is to create a horizontal division of territories under which each abstracter is assured of a monopoly of the abstracting business in the county where the abstracter is licensed to operate. See United States v. Topco Associates, Inc., 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972) ("One of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition.") We take this latter argument to be directed mainly at the abstract plant requirement which states that the plant must contain an index and that the index "must be made from an actual check of each page of each book of recorded instruments in [the register of deeds'] office, and in no case will a copy or film of the numerical index in the register's office be accepted." ARSD § 20:36:04:01.[9] According to First American, these anticompetitive effects require preemption of the challenged statute and regulations under the Sherman Act.
 
 
 44
 In arguing for preemption, First American claims neither to seek "any sweeping repudiation of state statutory and regulatory provisions," nor to "seek a finding of unconstitutionality of any state statutes." Brief of First American at 43. On the contrary, the result of a successful preemption attack upon a state statute is that the statute is stricken down as unconstitutional under the Supremacy Clause. See, e.g., Seagram & Sons v. Hostetter, 384 U.S. 35, 45, 86 S.Ct. 1254, 1260-61, 16 L.Ed.2d 336 (1966). Accordingly, it is clear that First American is making a facial challenge to the above-indicated statute and regulations which are said to conflict with the Sherman Act. We also clarify that although First American's preemption argument appears to be directed against all defendants without differentiation, the only defendants against whom the argument necessarily can be directed are the State of South Dakota and the Board of Examiners. The state (in the form of its legislature) and the Board promulgated and enforce[10] the challenged statute and regulations; consequently, it is they who would be enjoined from enforcing the challenged aspects of the regulatory scheme if First American were to prevail. We trouble to clarify these points because they are important to our ensuing discussion of the preemption/state action issues.
 
 A.
 
 45
 A due regard for federalism led the Supreme Court to create what is referred to as the state action doctrine in Parker v. Brown, supra. A raisin producer attempted to use the Sherman Act in Parker to strike down a marketing program enacted by the California legislature to create price supports for raisins. The Court assumed that the program would have violated the Sherman Act if it had been devised and carried out by private individuals or corporations. But because the marketing program "derived its authority ... from the legislative command of the state," id., 317 U.S. at 350, 63 S.Ct. at 313, the program was not prohibited by the Sherman Act. The Court found no intent in the Sherman Act to occupy a field so broad that it precluded the states, acting in their sovereign capacities, from exercising their broad police powers to effect economic regulations.[11] "In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." Id. 317 U.S. at 351, 63 S.Ct. at 313.
 
 
 46
 Of late, the state action doctrine has become a road well-traveled by the Court.[12] Its signposts, however, remain less than clear. We know, for example, that when a state legislature enacts an otherwise unlawful anticompetitive system of regulation, such regulation is "outside the reach of the antitrust laws under the 'state action' exemption" provided that the regulations reflect a state policy "clearly articulated and affirmatively expressed, designed to displace unfettered business freedom" with regulation. New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 439 U.S. 96, 109, 99 S.Ct. 403, 411, 58 L.Ed.2d 361 (1978). This state policy must be articulated by the state acting in its sovereign capacity; this much is clear from Parker itself. Naturally the question arises--what constitutes an articulation of the state in its sovereign capacity? Certainly enactments of a state legislature qualify as the state acting in its sovereign capacity. Orrin W. Fox, supra; Parker, supra. Also, the state supreme court acting in its supervisory capacity over the practice of law qualifies as the state acting in its sovereign capacity. Bates v. State Bar of Arizona, 433 U.S. 350, 359-60, 97 S.Ct. 2691, 2696-97, 53 L.Ed.2d 810 (1977); Goldfarb v. Virginia State Bar, 421 U.S. 773, 789-90, 95 S.Ct. 2004, 2014, 44 L.Ed.2d 572 (1975).
 
 
 47
 On the other hand, "state agencies or subdivisions of a State ... simply by reason of their status as such," apparently do not qualify as the state acting in its sovereign capacity. City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 408, 98 S.Ct. 1123, 1134, 55 L.Ed.2d 364 (1978). Actions by such bodies, however, may reflect a state policy to displace competition with regulation. Such actions will not be subject to scrutiny under the Sherman Act provided that "an adequate state mandate for anticompetitive activities exists." Id., 435 U.S. at 415, 98 S.Ct. at 1138. This mandate exists "when it is found 'from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of.' " Id.
 
 
 48
 Finally, we observe that conduct by a private party may be cloaked with state action immunity provided that the conduct was pursuant to a "clearly articulated and affirmatively expressed" state policy and that the conduct was "actively supervised"[13] by the state itself. California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc., 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980).
 
 B.
 
 49
 We therefore see the state action doctrine to be a construct developed by the Court and based upon principles of federalism which permits the coexistence of the Sherman Act and apparently conflicting state economic regulation. Absent the state action doctrine, the Sherman Act preempts the conflicting state regulation. Rice v. Norman Williams Co., --- U.S. ----, 102 S.Ct. 3294, 3299, 73 L.Ed.2d 1042, 1049 (1982) (The Sherman Act will preempt a state statute if "there exists an irreconcilable conflict between the federal and state regulatory schemes."). It is then self-evident that application of state action principles follows the antitrust court's initial determination that there is truly a conflict between the Sherman Act and the challenged regulatory scheme. See, e.g., Midcal, supra, 445 U.S. at 102, 100 S.Ct. at 941 ("The threshold question is whether California's plan for wine pricing violates the Sherman Act."); Parker, supra, 317 U.S. at 350, 63 S.Ct. at 313 ("We may assume for present purposes that the California prorate program would violate the Sherman Act ....").
 
 
 50
 In Rice, supra, the Court set out how the antitrust court is to analyze whether a state regulatory scheme conflicts with the Sherman Act when aspects of the state scheme are challenged in the abstract.
 
 
 51
 [A] state statute, when considered in the abstract, may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute. Such condemnation will follow under § 1 of the Sherman Act when the conduct contemplated by the statute is in all cases a per se violation. If the activity addressed by the statute does not fall into that category, and therefore must be analyzed under the rule of reason, the statute cannot be condemned in the abstract. Analysis under the rule of reason requires an examination of the circumstances underlying a particular economic practice, and therefore does not lend itself to a conclusion that a statute is facially inconsistent with federal antitrust laws.
 
 
 52
 Id., 102 S.Ct. at 3300, 73 L.Ed.2d at 1051. The challenged statute in Rice empowered liquor distillers to designate which California wholesalers may import the distiller's product into the state. The Court characterized the conduct allowed by the statute as a vertical nonprice restraint; such restraints have been held not to be per se violations of the Sherman Act. Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 57-59, 97 S.Ct. 2549, 2561-62, 53 L.Ed.2d 568 (1977). Accordingly, the Court held that there was no irreconcilable conflict between the state statute and the Sherman Act; hence, there was no preemption by the Act.[14] The Court noted that "Because of our resolution of the preemption issue, it is not necessary for us to consider whether the statute may be saved from invalidation under the doctrine of Parker v. Brown ...." Rice, supra, 102 S.Ct. at 3301 n. 9, 73 L.Ed.2d at 1052 n. 9.
 
 C.
 
 53
 Applying the above principles to the instant case, we arrive at the following conclusions. Initially, the district court, in analyzing First American's Sherman Act challenges to aspects of South Dakota's regulation of the business of abstracting, applied the two Midcal criteria and concluded that the state action doctrine immunized the regulatory scheme from Sherman Act scrutiny. As we have stated, however, the Midcal criteria apply only in the context of whether a private party's conduct is immunized from Sherman Act scrutiny by the state action doctrine. See Gold Cross Ambulance & Trans. v. City of Kansas City, 705 F.2d 1005, 1014 (8th Cir.1983).
 
 
 54
 More fundamentally, we do not perceive that the aspects of South Dakota's regulatory scheme which are challenged by First American "irreconcilably conflict" with the Sherman Act under the principles of Rice, supra. We are told by First American that an irreconcilable conflict does exist because the rigorous abstract plant requirement of ARSD § 20:36:04:01 effectively forecloses competition in the abstracting business within a county and creates a horizontal division of territories, which is a per se violation of § 1 of the Sherman Act. See note 9 supra and accompanying text. But Rice states that for an irreconcilable conflict to arise, the challenged regulatory provision must contemplate conduct that "is in all cases a per se violation." Id., 102 S.Ct. at 3300, 73 L.Ed.2d at 1051. Regardless of whether the challenged regulation tends to have the anticompetitive effect claimed by First American, it cannot be said that the regulation mandates or authorizes conduct that in all cases constitutes a § 1 violation. First American and its principal, Linderman, exemplify this. In 1973, Linderman became a licensed abstracter in Pennington County which indicates that Linderman was able to fulfill the abstract plant requirement and thus compete on an equal footing with the other licensed abstracter in Pennington County at that time, Theresa Burke. Accordingly, we hold that because no irreconcilable conflict exists between the Sherman Act and the abstract plant requirement, the Sherman Act does not preempt the requirement.
 
 
 55
 Furthermore, even if we assumed that the challenged aspects of the regulatory scheme conflicted with the Sherman Act sufficiently to require preemption, we would hold that the scheme reflects a clearly articulated and affirmatively expressed state policy to replace unfettered business freedom with regulation. See Orrin W. Fox, supra, 439 U.S. at 109, 99 S.Ct. at 411. Thus the state action doctrine would apply to preclude preemption. The state as sovereign enacted the challenged countersignature statute, SDCL § 58-25-16, and although it is within the code chapter regulating the business of title insurance, it undoubtedly regulates the business of abstracting as well. In fact, First American's complaint about the statute relates to its anticompetitive effect on the business of abstracting.
 
 
 56
 The statutory requirement that a title insurance policy be signed by a licensed abstracter who, by regulation, has searched both his own title plant and the official county records (ARSD § 20:36:07:01) before countersigning ensures that someone whom the State of South Dakota deems qualified has performed a professional title search before title to property is transferred. Indeed, First American at oral argument appeared to have no quarrel with this policy, stating that it did not really object to the countersignature requirement, but only objected to the regulations which precluded Linderman, a licensed abstracter, from searching official county records outside of Pennington County and countersigning title insurance policies based on his search of those records. According to First American, the state's requirement that an abstracter have an abstract plant in each county in which the abstracter wishes to do business serves only anticompetitive ends. The State of South Dakota at trial justified its abstract plant requirement by introducing evidence which indicated the poor--in some cases illegible--condition of many counties' official records. Thus the state requires an actual check, in lieu of copies, of each page of the official county records in constructing an index for the abstract plant.
 
 
 57
 We do not fulfill our role as the antitrust court by determining whether the manner in which the State of South Dakota regulates the business of abstracting is wise or appropriate. This type of judicial inquiry by the federal courts has long been repudiated in the context of due process. See Ferguson v. Skrupa, 372 U.S. 726, 731, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963) (The Due Process Clause does not empower the judiciary "to sit as a 'superlegislature to weigh the wisdom of legislation' ...."). Rather we fulfill our role by determining whether the state as a sovereign, in the broad exercise of its police powers, has chosen "to displace competition with regulation ...." City of Lafayette, supra, 435 U.S. at 413, 98 S.Ct. at 1137.
 
 
 58
 Certainly regulation of the business of title insurance falls within the state's broad police powers. As the South Dakota Supreme Court observed in response to a due process challenge to the fee schedule for abstracters' services, which at the time was established by state statute:
 
 
 59
 Because the abstractors' product is an indispensable part of real property transfers and due to the reliance which must necessarily be placed upon it by the vendor and vendee alike, the legislature has properly exercised its police power by the enactment of Ch. 36-13 [Abstracters of Title]. It is evident that there does exist a real and substantial relation between the regulatory means adopted in regard to price regulation and the actual or manifest evil possible due to the monopolistic nature of the business.
 
 
 60
 Siefkes v. Clark Title Co., 88 S.D. 81, 215 N.W.2d 648, 652 (1974).[15] The pervasiveness of South Dakota's regulation--to the point of mandating the fixing of prices for abstracters' services, SDCL § 36-13-25--indicates that the state has indeed chosen to displace competition with regulation in the business of abstracting.
 
 
 61
 First American argues that even if the statutes which regulate the abstracting business are protected by the state action doctrine, the regulations promulgated by the Board of Examiners are not because they do not qualify as enactments of the state as sovereign. We hold that the abstract plant regulation (ARSD § 20:36:04:01), the regulation requiring the abstracter to search both his own abstract plant and the official county records before countersigning (ARSD § 20:36:07:01), and the regulation requiring the search pursuant to the countersignature requirement to be under the supervision of a licensed abstracter (ARSD § 20:36:07:02) all to be actions clearly within the contemplation of the legislature in granting authority to the Board to regulate. See City of Lafayette, supra, 435 U.S. at 415, 98 S.Ct. at 1138.
 
 
 62
 South Dakota by statute requires that an abstracter maintain an abstract plant "showing in a sufficiently comprehensive form, all instruments affecting the title to real estate which are of record or on file in the office of the register of deeds ...." SDCL § 36-13-10. The Board of Examiners in turn sets out by regulation precisely what constitutes "sufficiently comprehensive form" for an abstract plant in ARSD § 20:36:04:01. South Dakota also requires by statute that an abstracter maintain a set of records for "each county wherein said person seeks to engage in compiling abstracts of land titles ...." SDCL § 36-13-10. In addition, SDCL § 36-13-26.1 requires the abstracter to examine record title and furnish a report to the title insurer before countersigning the title insurance policy. The Board of Examiners in turn sets out that the "examination of record title" required by SDCL § 36-13-26.1 must include an examination of both the abstracter's abstract plant and the official county records. ARSD § 20:36:07:01. The Board also requires that the search pursuant to the countersignature requirement be made "under the direction of an abstracter licensed in the county in which the property is located," ARSD § 20:36:07:02, to ensure that the search is not improperly delegated to one who has not met the requirements for becoming a licensed abstracter. Clearly the statutory provisions which govern the business of abstracting indicate that the challenged regulations of the Board of Examiners are the kind of action contemplated by the South Dakota legislature. Cf. Areeda, Antitrust Immunity for "State Action" After Lafayette, 95 Harv.L.Rev. 435, 445 n. 49 (1981) ("Immunity [under the state action doctrine] for decisions of subordinate agencies or officials cannot depend on an explicit command from the legislature; delegation of governmental powers necessarily includes the discretion to make decisions not compelled by the legislature."). To the extent that the challenged regulatory provisions impose an anticompetitive restraint upon First American, such restraint "is a necessary or reasonable consequence of engaging in the authorized activity." Gold Cross, supra, 705 F.2d at 1013.
 
 
 63
 First American relies on cases from the Ninth and Fifth Circuits in arguing that the challenged regulations were not compelled by the South Dakota legislature, thus they are not entitled to state action immunity. Ronwin v. State Bar of Arizona, 686 F.2d 692 (9th Cir.1981), cert. granted, --- U.S. ----, 103 S.Ct. 2084, 77 L.Ed.2d 296 (1983); United States v. Texas State Board of Accountancy, 464 F.Supp. 400 (W.D.Tex.1978), modified, 592 F.2d 919 (5th Cir.), cert. denied, 444 U.S. 925, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). Our above discussion should indicate, however, that we are in fundamental disagreement with our brethren in these circuits regarding application of the state action doctrine to state agencies or subdivisions. In both these cases, the courts cast the inquiry in mandatory terms--whether the challenged action by the state agency was compelled by the state legislature. In both cases there were vigorous dissents putting forth the view adhered to by this circuit: "that an adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found 'from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of.' " City of Lafayette, 435 U.S. at 415, 98 S.Ct. at 1138.
 
 
 64
 Accordingly, we conclude that the Sherman Act does not irreconcilably conflict with the challenged statute and regulations, and that, even if it did, the state action doctrine would operate to shield the regulatory provisions from antitrust scrutiny.[16]
 
 V.
 
 65
 In conclusion we observe that the regulations challenged here by First American undoubtedly restrained it from carrying on its business in the manner it desired. That the regulations, in this sense, have an anticompetitive effect does not invalidate them under the Sherman Act, "[f]or if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed." Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 133, 98 S.Ct. 2207, 2217, 57 L.Ed.2d 91 (1978).
 
 
 66
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 
 *
 The Honorable William C. Hanson, Senior District Judge for the Northern and Southern Districts of Iowa, sitting by designation
 
 
 [1]
 The district court's memorandum opinion sets out plaintiffs' basic allegations as follows:
 Plaintiffs allege that the Defendants conspired to: (a) fix the price to Plaintiffs of abstractor countersignatures on title insurance policies; (b) engage in frivolous and sham litigation by appealing the decision of the South Dakota Director of Insurance to grant a certificate of authority to Plaintiff First American Title Insurance Company to do business in South Dakota; (c) engage in frivolous and sham litigation by participating in the case of Fall River County Abstract Company v. Knutson, (6th Judicial Circuit Court, Hughes County, S.D., Nov. 6, 1979, Judge Robert A. Miller, presiding); (d) engage in efforts to influence the enactment of S.L.1979, ch. 345, amending SDCL 58-25-16, which had the effect of requiring all title insurance policies issued in the state to contain the countersignature of an abstractor; (e) enforce and attempt to enforce SDCL 58-25-16; (f) attempt to establish a fee schedule for countersignatures to be provided by abstractors on title insurance policies; (g) enforce and attempt to enforce ARSD § 20:36:04:01; (h) engage in a publicity campaign directed against the Plaintiffs, ostensibly directed toward influencing government action, which campaign was a sham to cover an attempt to interfere with the business relationships of Plaintiffs.
 First American Title Co. v. South Dakota Land Title Association, 541 F.Supp. 1147, 1150 (D.S.D.1982) (Bogue, Ch. J.).
 
 
 [2]
 Section 58-25-16 of the South Dakota Codified Laws provided:
 No foreign insurance company shall issue any policy of title insurance or certificate of title or other guarantee of title, covering any property located within the state of South Dakota, unless the same is countersigned by a person, partnership or corporation, who has met the requirements of §§ 36-13-8 and 36-13-10. Violation of this section is a Class 2 misdemeanor.
 This statute was amended by the South Dakota legislature in 1979. See Part I B infra.
 
 
 [3]
 The amended § 58-25-16 which became effective July 1, 1979, states:
 No insurance company shall issue any policy of title insurance or certificate of title or other guarantee of title, covering any property located within the state of South Dakota, unless the same is countersigned by a person, partnership or corporation, who has met the requirements of §§ 36-13-8 and 36-13-10 in the county in which the real property is located, or maintains an abstract plant in the county where the real property is located and meets the requirements of chapter 36-13. A violation of this section is a Class 2 misdemeanor.
 The emphasized portion indicates language which was added by amendment in 1979.
 
 
 [4]
 The legislature enacted SDCL § 36-13-26.1, which states, "An abstractor's countersignature on a title insurance policy is verification that the abstracter has furnished the insurer a report based on the examination of record title and any other title information and services required by the insurer and § 36-13-25."
 The legislature also amended SDCL § 36-13-25 to state in pertinent part that, "[The Board of Examiners] shall also establish a schedule of fees and the requirements for an abstracter's services for countersigning title insurance policies pursuant to § 58-25-16."
 The Board of Examiners subsequently promulgated regulations implementing these statutory changes. A title search--meaning a search of both the abstracter's plant and the official county records--is required before countersigning a title insurance policy. ARSD § 20:36:07:01. Additionally, the search is to be "made under the direction of an abstracter licensed in the county in which the property is located." ARSD § 20:36:07:02. This regulation also requires the abstracter's full cooperation with the title insurer by forbidding any unnecessary delays in performing the search and countersigning the policy: "Delays in the search or reporting shall be cause for complaint and disciplinary proceedings by the abstracters' board of examiners." Id.
 
 
 [5]
 We shall refer to appellants collectively as "First American" throughout the remainder of this opinion
 
 
 [6]
 This circuit recently refused to rely on the Duke & Co. coconspirator exception, noting that it has been subject to criticism. Westborough Mall, Inc. v. City of Cape Girardeau, 693 F.2d 733, 746 (8th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983); see Metro Cable Co. v. CATV of Rockford, Inc., 516 F.2d 220, 229-30 (7th Cir.1975); Fischel, Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine, 45 U.Chi.L.Rev. 80, 115 (1977) ("in most cases the co-conspirator exception is unworkable and should not be recognized")
 
 
 [7]
 SDCL § 58-6-8 requires the director of the Division of Insurance to hold a hearing in order to determine whether authority to engage in the insurance business should be granted. Part of this inquiry is a determination whether the grant of such authority would be in the public interest. Id
 
 
 [8]
 Apparently, the Association's asserted public interest concern (see note 7, supra ) was that untrained individuals could issue title insurance policies without the necessity of being supervised or trained by abstracters licensed by the State of South Dakota. Brief of the Association at 6-7. This situation prevailed as long as SDCL § 58-25-16 required only foreign insurance companies to obtain the countersignature of a licensed abstracter before issuing a policy of title insurance. The Association asserted its position without success before the Division of Insurance and before a state court. It appealed the state court's decision to the South Dakota Supreme Court, but abandoned this appeal following the amendment of SDCL § 58-25-16 which deleted the word "foreign" from the statute, thus extending the statute's requirements to domestic title insurance companies
 
 
 [9]
 See Brief of First American at 41 (where First American claims that the abstract plant requirement makes it "prohibitively expensive" to construct an abstract plant and that the effect of the regulation is to give "existing abstracters monopoly power over title services within their respective counties"). Apparently there was never any evidence offered at trial indicating exactly how costly it would be to assemble an abstract plant in accordance with ARSD § 20:36:04:01
 
 
 [10]
 The unauthorized conduct of the business of abstracting in South Dakota is a petty offense. SDCL § 36-13-9. The Board of Examiners is empowered to commence actions for injunctions against such unauthorized business as an alternative to the state's initiation of criminal proceedings. SDCL § 36-13-9.1. In addition, SDCL § 58-25-16 states that violation of its countersignature requirement "is a Class 2 misdemeanor."
 
 
 [11]
 Of course the state's exercise of its police powers in effecting economic regulations may impermissibly impinge on other federal interests which do not concern us in the instant case--notably the interest in preventing significant burdens on interstate commerce which is protected by the Commerce Clause. See P. Areeda & D. Turner, Antitrust Law pp 219-20 (1978)
 
 
 [12]
 See Community Communications Co. v. City of Boulder, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); California Retail Liquor Dealers Assn. v. Midcal Aluminum Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978); City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975)
 
 
 [13]
 Uncertainty exists regarding whether the second Midcal criterion--the requirement of active state supervision--applies to conduct by municipalities and other state subdivisions as well as to conduct by private parties. The Court expressly declined to address this issue in Community Communications Co. v. City of Boulder, 455 U.S. 40, 51 n. 14, 102 S.Ct. 835, 841 n. 14, 70 L.Ed.2d 810 (1982) ("Because we conclude in the present case that Boulder's moratorium ordinance does not satisfy the 'clear articulation and affirmative expression' criterion, we do not reach the question whether that ordinance must or could satisfy the 'active state supervision' test focused upon in Midcal.")
 This circuit has answered this question in the negative in the context of municipal conduct. Gold Cross Ambulance & Trans. v. City of Kansas City, 705 F.2d 1005, 1014 (8th Cir.1983) ("[T]he state supervision requirement is intended to control the potential for abuse created by authorizing private persons to make anticompetitive decisions and to insure that those decisions are consistent with the clearly articulated and affirmatively expressed state policy at stake."). The court's reasoning in Gold Cross was fourfold: municipal officials are generally politically accountable to their citizens, which keeps those officials in check; requiring state authorization for local government conduct is analogous to requiring active supervision of private conduct; it would make little sense to require the state to supervise and enforce municipal ordinances; and state supervision could lead to duplicative, wasteful regulation as well as the erosion of local autonomy. Id., 705 F.2d at 1014-15. But see Ronwin v. State Bar of Arizona, 686 F.2d 692, 696 (9th Cir.1981), cert. granted, --- U.S. ----, 103 S.Ct. 2084, 77 L.Ed.2d 296 (1983) (The court held in the context of challenged action by the state supreme court-appointed committee which grades the Arizona bar examination that the acts of this governmental body had to be "actively supervised by the state itself" in order to be immune from Sherman Act scrutiny.).
 
 
 [14]
 The Court indicated that the conduct of a particular distiller under the statute would not necessarily be insulated from scrutiny under the Sherman Act, even though there was no basis "for condemning the statute itself by force of the Sherman Act." Rice v. Norman Williams Co., --- U.S. ----, 102 S.Ct. 3294, 3301, 73 L.Ed.2d 1042, 1052 (1983)
 
 
 [15]
 See also 1 Am.Jur.2d Abstracts of Title § 4 at 230 (1962) ("The inherent police power of the states permits reasonable regulation of businesses or professions when such regulation appears necessary for the general welfare of the people, and in the exercise of this power, a state may impose reasonable regulations upon those who seek to engage in the business of abstracting titles to real estate.")
 
 
 [16]
 It is thus unnecessary to consider the district court's alternative holding that the countersignature statute is exempt from antitrust scrutiny under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-15, because the statute constitutes state regulation of the "business of insurance." See Union Labor Life Ins. Co. v. Pireno, --- U.S. ----, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982)
 Additionally, we reject First American's contention that the district court failed to consider its claims under § 2 of the Sherman Act. 15 U.S.C. § 2. If the alleged private price-fixing conspiracy was supposed to be evidence of monopolization, the claim failed for lack of proof. If the lobbying and litigation activity which has been held immune from antitrust scrutiny under Noerr-Pennington is alleged to be evidence of an attempt or a conspiracy to monopolize, then Noerr-Pennington applies to immunize defendants from these claims as well.